# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION

KELLEY ANN PHILLIPS,

                Plaintiff,

-vs-                                            Case No.  6:15-cv-409-Orl-DAB

COMMISSIONER OF SOCIAL
SECURITY,

                Defendant.

_____

## MEMORANDUM OPINION & ORDER

The Plaintiff brings this action pursuant to the Social Security Act (the Act), as amended, Title 42 United States Code Section 405(g), to obtain judicial review of a final decision of the Commissioner of the Social Security Administration (the Commissioner) denying her claim for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits under the Act.

The record has been reviewed, including a transcript of the proceedings before the Administrative Law Judge (ALJ), the exhibits filed and the administrative record, and the pleadings and memoranda submitted by the parties in this case.

For the reasons that follow, the decision of the Commissioner is **REVERSED** and **REMANDED.**

# I.       BACKGROUND

## A.       Procedural History

Plaintiff filed for a period of disability, DIB and SSI benefits on September 6 and 7, 2010, alleging an onset of disability on August 25, 2010, due to severe neck and back pain with herniated disks and severe muscle spasm, memory loss, two head traumas with concussions, severe headaches, loss of critical thinking, word-finding problems, post-concussion syndrome, inability to concentrate,

and dizziness. R. 97, 245, 247. Her application was denied initially and upon reconsideration. R. 109, 140-41. Plaintiff requested a hearing, which was held by video in Melbourne, Florida on March 28, 2013, before Administrative Law Judge George Michael Gaffaney (hereinafter referred to as "ALJ") presiding from Chicago, Illinois. R.50-85. In a decision dated July 9, 2013, the ALJ found Plaintiff not disabled as defined under the Act through the date of his decision. R. 23-39. Plaintiff timely filed a Request for Review of the ALJ's decision, which the Appeals Council denied on January 21, 2015. R. 1-4. Plaintiff filed this action for judicial review on March 12, 2015. Doc. 1.

### B.    Medical History and Findings Summary

Plaintiff was born on April 24, 1978, making her thirty-five years old on the date of the decision. R. 245. Plaintiff completed four years of college and medical school. R. 270. She had worked as a sports instructor and a surgical resident. R. 79. Although Plaintiff did not perform her surgical resident duties after August 2010 when she went on formal medical leave, she received full wages until her termination date of June 30, 2011; thereafter, the claimant received long-term disability benefits. R. 28.

Plaintiff's medical history is set forth in detail in the ALJ's decision. By way of summary, Plaintiff complained of severe neck and back pain, muscle spasms, head concussions, memory loss, severe headaches, loss of critical thinking, word-finding problems, post-concussion syndrome, inability to concentrate, and dizziness. R. 269. After reviewing Plaintiff's medical records and Plaintiff's testimony, the ALJ found that Plaintiff suffered from post-concussion syndrome, degenerative disc disease of the lumbar spine, cervicalgia, thoracic spine pain, anxiety disorder, panic disorder, adjustment disorder, which were "severe" medically determinable impairments, but were not impairments severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. R. 28-29. The ALJ determined that Plaintiff retained the residual

functional capacity (RFC) to perform a reduced range of sedentary work; her mental impairments would limit her to simple, routine, unskilled tasks with only an occasional change in a routine work setting and occasional interaction with the public.  R. 30.  Based upon Plaintiff's RFC, the ALJ determined that she could not perform past relevant work.  R. 37.  Considering Plaintiff's vocational profile and RFC, the ALJ applied the Medical-Vocational Guidelines (the grids), 20 C.F.R. Pt. 404, Subpt. P, App. 2, and, based on the testimony of the vocational expert ("VE"), the ALJ concluded that Plaintiff could perform work existing in significant numbers in the national economy as a circuit board assembler, inspector, and machine feeder.  R. 38.  Accordingly, the ALJ determined that Plaintiff was not under a disability, as defined in the Act, at any time through the date of the decision. R. 38.

Plaintiff now asserts two points of error.  First, she argues that the ALJ erred by failing to include limitations from her headaches in the RFC.  Second, she contends that the ALJ erred by finding she had the RFC to perform a reduced range of sedentary work contrary to the weight to the treating physicians' statements. For the reasons that follow, the decision of the Commissioner is **REVERSED** and **REMANDED**.

## II.    STANDARD OF REVIEW

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971).  The Commissioner's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla – *i.e.*, the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th

Cir. 1995) (citing *Walden v. Schweiker*, 672 F.2d 835, 838 (11ᵗʰ Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

"If the Commissioner's decision is supported by substantial evidence, this Court must affirm, even if the proof preponderates against it." *Phillips v. Barnhart*, 357 F.3d 1232, 1240 n. 8 (11th Cir. 2004). "We may not decide facts anew, reweigh the evidence, or substitute our judgment for that of the [Commissioner.]" *Id.* (internal quotation and citation omitted). *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11ᵗʰ Cir. 2005). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560; *accord, Lowery v. Sullivan*, 979 F.2d 835, 837 (11ᵗʰ Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings).

The ALJ must follow five steps in evaluating a claim of disability. *See* 20 C.F.R. §§ 404.1520, 416.920. First, if a claimant is working at a substantial gainful activity, she is not disabled. 20 C.F.R. § 404.1520(b). Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled. 20 C.F.R. § 404.1520(c). Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled. 20 C.F.R. § 404.1520(d). Fourth, if a claimant's impairments do not prevent her from doing past relevant work, she is not disabled. 20 C.F.R. § 404.1520(e). Fifth, if a claimant's impairments (considering her residual functional capacity, age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled. 20 C.F.R. § 404.1520(f).

## III.    ISSUES AND ANALYSIS

### A. Headaches

Plaintiff argues that the ALJ erred in finding that her headaches were not a severe impairment because she "only experiences these headaches four times per month and they always have an aura." R. 28.  She argues that the ALJ ignored Plaintiff's testimony about her severe daily headaches, they last hours, and, since her head injuries, her vision is blurry and sometimes doubled.   The Commissioner contends that Plaintiff failed to prove that she had a severe impairment due to headaches and that her impairments, whether severe or not severe, caused additional limitations on her ability to work.   The Commissioner also argues that Plaintiff occasionally complained of headaches, but the medical records do not indicate that her alleged headaches would have affected her ability to work, particularly for any consecutive twelve-month period.

At Step 2 of the five-step evaluation process, the ALJ is called upon to determine whether a claimant's impairments are severe.  By definition, this inquiry is a "threshold" inquiry.  It allows only claims based on the most trivial impairments to be rejected.  In this Circuit, an impairment is not severe only if the abnormality is so slight and its effect so minimal that it would clearly not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience.  A claimant need show only that her impairment is not so slight and its effect not so minimal.  *McDaniel v. Bowen*, 800 F.2d 1026, 1031 (11th Cir. 1986).

The finding of *any* severe impairment, based on either a single impairment or a combination of impairments, is enough to satisfy step two because once the ALJ proceeds beyond step two, he is required to consider the claimant's entire medical condition, including impairments the ALJ determined were not severe.  *Burgin v. Commissioner of Soc. Sec.*, 420 F. App'x 901, 902 (11th Cir. 2011) (unpublished disposition) (citing *Jamison v. Bowen*, 8 14 F.2d 585, 588 (11th Cir. 1987); *see also Tuggerson-Brown v. Commissioner of Soc. Sec.*, 572 F. App'x 949, 951-52 (11th Cir. 2014) ("Based on our precedent and the regulations, therefore, it is apparent that there is no need for an ALJ to identify every severe impairment at step two.").  The ALJ must make specific and well-articulated

findings as to the effect of the combination of all of the claimant's impairments. *Burgin*, 420 F. App'x at 902 (citing *Bowen v. Heckler*, 748 F.2d 629, 635 (11th Cir. 1984)).   A clear statement that the ALJ considered the combination of impairments generally constitutes an adequate expression of such findings.  *Burgin*, 420 F. App'x at 902 (citing *Jones v. Department of Health & Human Servs.*, 94 1 F.2d 1529, 1533 (11th Cir. 1991)).   Here, the ALJ found Plaintiff had several other severe impairments – post-concussion syndrome, degenerative disc disease of the lumbar spine, cervicalgia, thoracic spine pain, anxiety disorder, panic disorder, and adjustment disorder ®. 28)– which was enough to lead him to the next steps in the sequential evaluation.  Whether the ALJ adequately considered Plaintiff's "entire medical condition"–including any alleged impairments he found to be non-severe impairments in combination with the severe impairments– at the other Steps and in the RFC determination, is a separate issue addressed below.

### B.     RFC and the treating physicians' opinions, and the timing of the opinions

### 1. *Physical limitations*

Plaintiff claims that the ALJ should not have found her able to perform a reduced range of sedentary work in light of limitations assigned by several treating physicians, Drs. Gopal and Weiss which would preclude the performance of sedentary work.  The Commissioner responds that the ALJ properly evaluated all of the doctors' reports and opinions in assessing Plaintiff's RFC, and substantial evidence supports the weight the ALJ gave the doctors' opinions. R. 30-37.

Residual functional capacity is an assessment based on all relevant evidence of a claimant's remaining ability to do work despite her impairments.  20 C.F.R. § 404.1545(a); *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997).  The focus of this assessment is on the doctor's evaluation of the claimant's condition and the medical consequences thereof.  *Id.*  Substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise.  *See Lewis*, 125 F.3d at 1440; *Edwards*, 937 F.2d at 583; 20 C.F.R. §§ 404.1527(d),

416.927(d).  If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.  *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also Schnorr v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987).

The Social Security Regulations establish a "hierarchy" among medical opinions that provides a framework for determining the weight afforded each medical opinion: "[g]enerally, the opinions of examining physicians are given more weight than those of nonexamining physicians, treating physicians' opinions are given more weight than non-treating physicians and the opinions of specialists are given more weight on issues within the area of expertise than those of nonspecialists." *McNamee v. Soc. Sec. Admin.*, 162 F. App'x 919, 923 (11th Cir. Jan. 31, 2006) (unpublished) (citing 20 C.F.R. § 404.1527(d)(1), (2), (5)).  The following factors are relevant in determining the weight to be given to a physician's opinion: (1) the "[l]ength of the treatment relationship and the frequency of examination"; (2) the "[n]ature and extent of [any] treatment relationship"; (3) "[s]upportability"; (4) "[c]onsistency" with other medical evidence in the record; and (5) "[s]pecialization." 20 C.F.R. §§ 404.1527(d)(2)-(5), 416.927(d)(2)-(5); see also 20 C.F.R. §§ 404.1527(f), 416.927(f).

Plaintiff essentially argues that the ALJ erred in failing to give the appropriate weight to the opinions of multiple of Plaintiff's treating physicians – Drs. Datta, Gopal, Weiss, Milstein, Elmore, and Bunt–and examining physicians–Drs. Facchini, Masure, Sachdev–and failed to appreciate the decline in Plaintiff's physical and mental conditions from 2011 to 2013, choosing instead to rely on outdated assessments with more mild findings before her condition worsened.

The Commissioner somewhat disingenuously claims that Plaintiff's arguments about the treating physician opinions are limited to whether she met § 1.04 of the Listing of Impairments for disorders of the spine, and whether Plaintiff waived any further argument because it was "only cursory." Doc. 21 at 10-11 (citing 20 C.F.R. Pt. 404, Subpt. P. App. 1, § 1.04A). The Commissioner misapprehends or mischaracterizes Plaintiff's actual argument, which is that the ALJ improperly assessed the treating physicians' opinions regarding her back condition and nerve root compression in assessing her RFC.

Although Plaintiff discusses with great particularity the specific objective medical records of herniated disks, nerve root compression, and physician opinions that this objective evidence supports her subjective complaints of pain precluding the performance of sedentary work, the Commissioner devotes just a couple of paragraphs to argue very generically:

> The aspects of the opinions of Dr. Weiss and Dr. Gopal that indicate Plaintiff could perform a reduced range of sedentary work are consistent with their own objective findings as well as the records and opinions of the other doctors, as discussed by the ALJ (Tr. 32-37). Contrary to Plaintiff's arguments, the records and opinions of Julio Westerband, M.D., Mark Milstein, M.D., Kuldip Sachdev, M.D., Andres Schneeberger, M.D., and Richard Bunt, M.D., when considered together and with the record as a whole, provide substantial evidence to support the ALJ's finding that Plaintiff could perform a reduced range of sedentary work (Tr. 32-37, 561-603, 605-25, 640-42, 644, 646-47, 1444-56, 1629, 1631-60, 2198-230, 2435-44, 2445-50). Plaintiff seeks to have each opinion and piece of evidence considered in isolation (Pl.'s Mem. 27-30), but the ALJ had to consider all relevant evidence as a whole in assessing Plaintiff's RFC and in evaluating the medical source opinions. See 20 C.F.R. §§ 404.1527(c), 404.1545(a), 404.1546(c), 416.927(c), 416.945(a), 416.946(c). The ALJ properly considered the record as a whole, and substantial evidence supports his assessment of Plaintiff's RFC.

Doc. 21 at 14-15. The Commissioner lists the names of **five** other treating physicians and lists at least 155 pages from the 2500-page Record, but does not discuss even a *single piece* of this evidence to which the Commissioner refers as "substantial evidence." The Commissioner's lack of specificity and particularized discussion belies the claim that the ALJ "properly considered the record as a whole."

Plaintiff is correct that the ALJ incorrectly found, in the early pages of the decision (in discussing Listing § 1.04), that "the Record is devoid of evidence of nerve root compression." R. 29. As Plaintiff's treating orthopedic surgeon, Dr. Datta, noted, the CT of the lumbar spine post diskogram dated December 27, 2012, showed a "left-sided moderate to large size disc protrusion with associated annular tear impressing on the left S1 nerve root" with resulting mild to moderate left neural foraminal narrowing. R. 2034-39. Dr. Datta also diagnosed Plaintiff with debilitating back and right leg pain with concordant reproduction on diskogram; chronic neck and bilateral arm pain and mild bulging disks of the cervical spine, greatest at C5-C6, C6-C7. R. 2034. Dr. Datta recommended a L5-S1 laminectomy, fusion, and TLIF (Transforaminal Lumbar Interbody Fusion) and estimated it had a 70% chance of success in relieving her hack and leg pain with surgery. R. 2034. Although the ALJ stated that he gave "weight" to Dr. Datta's opinion because he "is a specialist and his opinion is based on objective and clinical findings" R. 35), the ALJ failed to recognize that Dr. Datta (and others) had opined there was evidence of nerve root compression.

The Commissioner argues that the ALJ was not required to discuss the November 2010 MRI scan and December 2012 CT scan showing nerve root compression because an ALJ is not required to discuss "each and every aspect" of a doctor's opinion, "even if the doctor is a treating doctor" citing the unpublished Eleventh Circuit's per curiam opinion in *Adams v. Commissioner*, 586 F. App'x 531, 533-34 (11th Cir. 2014)[1], rather the Eleventh Circuit's published decision of *Winschel v. Commissioner of Social Security*, 631 F.3d 1176, 1178–79 (11th Cir. 2011). In *Winschel*, the Eleventh Circuit held that whenever a physician offers a statement reflecting judgments about the

---

[1] The full quotation from *Adams v. Commissioner.*, 586 F. App'x 531, 533 (11th Cir. 2014) is: "[T]there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decision" enables the district court "to conclude that the ALJ considered [the claimant's] medical condition as a whole." *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir.2005) (quotations and alterations omitted).

nature and severity of a claimant's impairments, including symptoms, diagnosis, and prognosis, what

the claimant can still do despite his or her impairments, and the claimant's physical and mental

restrictions, the statement is an opinion requiring the ALJ to state with particularity the weight given

to it and the reasons therefor. *Id.* (citing 20 CRF §§ 404.1527(a)(2), 416.927(a)(2). In this case, the

ALJ failed to adequately state the comparative weight given to the opinions of the physicians, and

completely failed to address the opinions of others, such as Dr. Layton, as well as completely

misrepresented certain evidence in the Record on a critical issue, *i.e.*, that "the record is devoid of

evidence of nerve root compression" when several physicians found nerve root compression and

recommended surgery. R.29.

As in other cases before this Court[2], the Commissioner insists on citing to a pre-*Winschel* case,

*Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005), for the proposition that "there is no rigid

requirement that the ALJ specifically refer to every piece of evidence in his decision." Doc. 21 at 11.

However, that is no longer the standard with regard to treatment notes from treating physicians that

reflect judgments about Plaintiff's impairments, at least in this circuit.

The Eleventh Circuit's opinion in *Winschel* was very critical of the ALJ's lack of discussion

of relevant treatment notes:

> In this case, the ALJ referenced Winschel's treating physician only once, and that
> reference merely noted that Winschel saw the doctor monthly. The ALJ did not
> mention the treating physician's medical opinion, let alone give it "considerable
> weight." Likewise, the ALJ did not discuss pertinent elements of the examining
> physician's medical opinion, and the ALJ's conclusions suggest that those elements
> were not considered. It is possible that the ALJ considered and rejected these two
> medical opinions, but without clearly articulated grounds for such a rejection, we
> cannot determine whether the ALJ's conclusions were rational and supported by
> substantial evidence. Accordingly, we reverse. On remand, the ALJ must explicitly
> consider and explain the weight accorded to the medical opinion evidence.

---

[2]*See,* e.g., *Mieles v. Commissioner of Social Security*, Case No.  6:13-cv-91-Orl-DAB (Jan. 10, 2014); *Parrillo v. Commissioner of Social Security*, Case No. 6:12-cv-1551-Orl-DAB (March 19, 2014).

*Winschel*, 631 F.3d at 1179.  The Commissioner argues that the ALJ was not required to discuss the opinions of treating physicians based on the objective evidence of nerve root compression because "Plaintiff failed to prove that the imaging showed . . .  additional limitations on her ability to work" or that her impairments equaled Listing 1.04.  The Commissioner alternatively contends that the ALJ provided good reasons, supported by substantial evidence, for giving "some weight" to, or partially discounting, the opinions of Drs. Gopal and Weiss.  Doc. 21 at 10-11 (citing R.. 32-37 (ALJ decision), 2021-28, 2404-11, 2419-26 (physicians' records)).

As an initial matter, despite a Record consisting of approximately 2500 pages and 71 separate sets of medical records[3] containing conflicting opinions from treating physicians and one-time examining physicians preparing IMEs for the insurance companies, the ALJ fails to specifically describe the relative *amount* of weight that he gave to the varying opinions of the physicians in question, in contravention of *Winschel*.  Instead, the ALJ merely summarized portions of some (but not all) of the treatment records, especially those supporting his finding of an RFC for sedentary work, and omitting the portions of physician opinions to the contrary.  The ALJ repeatedly states that he gave "weight" or "some weight" to virtually *all* of the opinions–even though many of them conflicted[4]– and ignored the essential findings of the most favorable opinions, particularly those of Dr. Datta and Dr. Weiss, as pointed out by Plaintiff.  Moreover, the ALJ fails to consistently distinguish between consultative examining physicians (hired by the insurers),  the opinions of treating physicians, and those who are orthopedic or neurology specialists, whose opinions deserve more weight.  Accordingly, the ALJ's decision is not based on substantial evidence.

It is undisputed that Plaintiff had a series of back, neck, and head injuries over a two year period that led to her various impairments.  Only the severity and permanency of her impairments is

---

[3]The ALJ described these records as a "significant and voluminous history of medical treatment."  R. 32.

[4]The ALJ gave "less weight" to the opinion of the state agency non-examining reviewing physician who opined plaintiff could perform the exertional demands of a reduced range of light work.  R. 35.

disputed.   Based on her description of her history given for a comprehensive examination and the medical records provided in support, she first had a motor vehicle accident in 2008 from which she recovered completely after physical therapy.  R. 2438.  She had a second motor vehicle accident on June 3, 2010 when she was rear ended; she did not go to the emergency room right away but within an hour she developed generalized, severe, throbbing headaches, neck, upper, and middle and lower back and bilateral shoulder pain, and went later that day; she was given Valium and Percocet and released.  R. 2436.  Plaintiff saw her primary care physician a few days later who continued her medication and prescribed physical therapy, which helped a bit. R. 2436.

From July to September 2010, she returned to the emergency room three times for intractable and severe pain when her medications were not controlling her pain; she had X-rays but no MRI/CT scans; after one-week stays in August and September 2010 when she was treated with intravenous pain medications; she was prescribed oral pain medication and was released home. R. 2436. On September 28, 2010, Plaintiff saw Dr. Gopal, a pain management specialist for complaints of sharp, dull, and throbbing neck pain radiating into the bilateral shoulders and low back pain. R. 793. In the examination, Dr. Gopal noted myofascial trigger points on palpation, limited lumbar flexion, extension, and lateral rotation in the back and neck, and myofascial trigger points on both sides in the lower trapezius area, and bilaterally in the upper back. R. 794. Dr. Gopal diagnosed Plaintiff with a lumbar spine herniated nucleus pulposis; backache; cervical-neck disorder; and unspecified myalgia and myositis; he recommended spinal facet/nerve blocks as well as Fentanyl patches, Colace, Cymbalta, Lyrica, and trigger point injections. R. 794-95. Dr. Gopal opined Plaintiff was "totally disabled" from September 30, 2010 to October 28, 2010 R. 631. In October 2010, Plaintiff returned to Dr. Gopal complaining of increased low back pain; she had severe muscle spasms in the cervical spine and moderate spasms in the lumbar spine, limited flexion and extension of the lumbar spine due to pain, and she could not sit for prolonged periods; he prescribed more physical therapy, and she

subsequently reported mild progress with her pain. R. 741, 771-75. A November 3, 2010 lumbar MRI revealed at L5-S1 asymmetric disc bulge to the left causing compression of the left S1 nerve root. R. 807. There was a loss of height at L5-S1 and degenerative changes of the facet joints bilaterally. R. 807.

In November 2010 Plaintiff was referred to a pain specialist, who stopped the Valium and prescribed Zanaflex, which caused side effects of drowsiness, slurred speech, and dizziness, and she reduced the Zanaflex to half by herself. R. 2437. One night she took half of a Zanaflex at 3:00 a.m and the next thing she remembered was lying in an empty bath tub in a crumpled up position with a large swelling over the back of her head. R. 2437. She experienced excruciating headaches, bilateral neck, shoulder and lower back pain; she felt nauseated and had vomiting, slurred speech, photophobia, dizziness, could not focus, and did not remember much of what was going on around her. R. 2437. She was admitted to the hospital for two weeks, treated with intravenous pain medication, a lumbar epidural injection, and MRI and CT scans were ordered. R. 2437. She was evaluated by a pain management specialist who advised her to continue with physical therapy, which she did for six to seven months until the insurance company stopped paying for it in spring 2011. R. 2437.

Between November 2010 and January 2011, she restarted physical therapy and she received multiple trigger point injections in her neck and shoulders. She had two epidural steroid injections in the lumbar spine and 2-3 facet joint injections in the right and left sides of the cervical spine. R. 741, 758, 2437. In late January 2011, Plaintiff rolled out of bed and hit her head on the nightstand and hyper-extended her neck; she was admitted to the hospital for a week; she had severe headaches, intractable neck and lower back pain, slurred speech, drowsiness and difficulty in concentration and focus. R. 618, 2437. In Dr. Milstein's January 2011 neurology consultation, he noted her brain MRI was normal, a cervical MRI showed very small disc bulges from C4 to C7 without nerve impingement, and a lumbar MRI revealed disc bulge at L5-S1 with some compression of the left S1

nerve root. R. 619. Dr. Milstein diagnosed chronic pain syndrome, exacerbated by acute fall, with no clear anatomic dysfunction; he noted Plaintiff appeared "quite depressed," and he suspected a great deal of her non-pain symptoms were related to multiple medications which could lead to fatigue and poor concentration. R. 619. He opined she had made gradual progress with her symptoms, had become progressively more functional over the months, and he was optimistic about her continued progress and recovery. R. 33. The ALJ gave "weight" to Dr. Milstein's opinion as "generally consistent with the other medical evidence of record." R. 33. On May 18, 2011, Dr. Milstein stated that the plaintiff had been under his care for over six months after the MVA of 2010 and syncopal episode associated with significant head trauma which had left her with a post-concussive chronic pain syndrome along with her residual neck and back pain. R. 647-48.

In the first half of 2011, Plaintiff returned to Dr. Gopal complaining of neck pain radiating into the bilateral posterior shoulders, upper midback pain, and low back pain radiating into the bilateral thigh, left greater than right, and right knee pain; she had myofascial trigger points and tenderness bilaterally in the back. R. 715-16, 734. He opined Plaintiff was unable to work. R. 693, 703-04, 717. Dr. Gopal opined Plaintiff was limited to fifteen minutes of sitting due to pain, though she had "fair" lumbar stability. R. 693.

In May 2011, Dr. Gopal opined Plaintiff was totally disabled from May 26, 2011 to October 1, 2011 with a diagnosis of lumbar radiculopathy, lumbar disc herniation, myalgia, neck pain, and upper back pain R. 651-52; *see also* R. 662 (Dr. Gopal's opinion that "[Plaintiff] is unable to stand or sit or walk for greater than 30 minutes, lift, bend or twist" and should be placed on disability). In June 2011, Plaintiff was dismissed from her surgical residency program in New York and moved to Florida to live with her mother. R. 680. In July/August 2011, Plaintiff was admitted to Holmes Regional Medical Center for severe neck and back pain (R. 1863-64, 1884) and treated with radio

frequency ablation at C3, C4 and C5 on the right side, which helped her neck pain for one to two months. R. 2437.

In October 2011, Plaintiff began treatment with neurologist Dr. Weiss for complaints of daily headaches, neck, and back pain; he diagnosed severe concussion with photophobia, nausea and vomiting. Plaintiff reported her headaches, decreased short term memory and lack of concentration began after the two falls when she hit her head. She reported her headaches were light and sound sensitive, with blurred vision and diplopia, concentration and word finding problems, lightheadedness and dizziness, slowly improving, and constant pain in the mid and low back varying in severity. R. 1407-08. Dr. Weiss noted Plaintiff's memory and cognitive abilities were reduced, and her range of motion in throughout the cervical, thoracic, and lumbar spine in all directions was reduced, and there were muscle spasms and tenderness. R. 1409. A lumbar MRI at L5-S1 revealed an asymmetric disc bulge to the left causing compression of the left S1 nerve root. A cervical MRI revealed mild disc bulges at C4-C5 through C6-C7 R. 1408. Dr. Weiss diagnosed (1) CHI (Closed Head Injury) with PT (Post traumatic) HA's (Headaches) and cognitive loss; (2) Neck pain with some radicular sx (symptoms); (3) Thoracic spine pain; (4) LBP (Low Back Pain) with radicular symptoms; and (5) Chronic pain with narcotic dependence. R. 1409-10. Dr. Weiss opined the Plaintiff's case was of high complexity. He prescribed Nucynta and ordered a QEEG/EEG. R. 1410. The results of the EEG were normal but the results of the Quantitative Electroencephalogram (QEEG) were abnormal[5] with the brain injury analysis positive for Closed Head Injury with a 95% probability. R. 1440.

In January 2012, Plaintiff returned to Dr. Weiss complaining of increased joint pain in bilateral thighs, knees, hips, and feet, localized at the joints, daily headaches, blurred/double vision and intermittent dizziness; she stated that she "can't get out of bed without medication." R. 1687. Dr.

---

[5]Dr. Sachdev noted that when Plaintiff had the brain mapping and QEEG evaluation, she was taking multiple psychoactive medications which can influence alertness and brain activity and have the potential to influence brain mapping and QEEG results. R. 2437

Weiss noted the cervical and lumbar spine ROM was reduced and the thoracic spine revealed spasms and tenderness. R. 1689. Dr. Weiss noted, in addition to diagnoses of closed head injury with headaches and cognitive loss; neck pain and thoracic and lumbar spine pain, and the new joint pain, Plaintiff had chronic pain with narcotic dependence and she would "still need to get all her narcotics from Dr. Rivera (one doctor only)" and he recommended tapering and discontinuing narcotics; she would likely need an inpatient pain program such as the Mayo Clinic or University of Miami.  R. 1690.  Dr. Weiss recommended Plaintiff get a rheumatology evaluation for the new joint pains. R. 1409-10.  Plaintiff had seen Dr. Rivera in October 2011 for a facet joint injection, but it only gave her pain relief at the C3-C5 level for a few days and her neck remained stiff, with a decreased range of motion with left and right rotation. R. 1414, 1461, 1841.

An April 16, 2012 MRI of lumbar spine showed a mild bulging disk at L4-L5 and associated facet arthropathy; (2) protrusion of the L5-S1 disk, slightly eccentric to the left, contacted the left S1 root minimally with a small left paramedian/posterolateral disk herniation. R. 1523.  By May 2012, Plaintiff had not shown any improvement and reported to Dr. Weiss that she was worse due to sacrum pain radiating down the right lower extremity with numbness and tingling, daily headaches, short term memory loss, three to four severe panic attacks per week, and a roaring noise in her bilateral ears lasting for seconds, but occurring daily. R. 1697. She did not feel the panic attacks were getting better. R. 1699. Dr. Weiss noted that the cervical and lumbar spine motions were both reduced and the thoracic spine exam revealed spasms and tenderness, and he opined that Plaintiff was TTD (Temporarily Totally Disabled) at this time.  R. 1699-1700.

Plaintiff was hospitalized again in September 2012 due to intractable back pain, and Dr. Dontineni prescribed intravenous Dilaudid.  R. 2062.  She was examined by orthopedic surgeon Dr. Hynes who noted tenderness to palpation of the cervical and lumbar paraspinal muscles and diagnosed (1) cervical spine pain with radiculopathy into the right upper extremity; (2) low Back Pain with

radiculopathy into the right lower extremity; (3) bilateral L5 pars defect; (4) multilevel bulging disks of cervical spine more significant on the right C5-C6; and (5) multilevel bulging disks of the lumbar spine most severe with protrusion of left L5-S1 with neural foraminal narrowing. R. 1537-38.

Plaintiff alleges several mental impairments, including depression and anxiety disorder with daily panic attacks. Dr. Layton, a pain management specialist, saw Plaintiff in the hospital on September 12, 2012 and, after examining her and the records from her prior hospital admissions, opined Plaintiff's "sensation of whole body numbness and the intermittent jerking is likely related to her anxiety disorder."   R. 1540.  Dr. Layton reviewed the MRI and noted Plaintiff had a "small leftward protrusion at L5-S1. It does cause patient more symptoms than most and this is also likely related to her underlying anxiety disorder.  The patient has been unresponsive to conservative measures."  R. 1607.  She also diagnosed cervicalgia with normal cervical MRI, generalized deconditioning, and severe deconditioning.  R. 1607.  Deconditioning is a complex process of physiological change following a period of inactivity, bedrest, or sedentary lifestyle which results in functional losses in mental status, degree of continence, ability to accomplish activities of daily living, and diminished muscle mass, and strength.[6]  Dr. Layton further opined:

> [B]y other notes on the chart, it is clear that surgery is anticipated. . .  The patient may very well be willing to follow this course of action.  I think that consulting Dr. Hynes is a fortuitous choice as his charitable foundation will be able to dramatically ease this patient's financial concerns.  In that light, I have suggested to the patient that the Back Center also take over her pain management which can also be paid through the foundation.  Her pain management needs should be relatively conservative.  This patient does have some poor coping skills and will need assistance and I would suggest limited use of opiates.

R. 1608.

Following discharge from the hospital in October 2012, Plaintiff went to the Back Center and was treated by Dr. Datta, a spine specialist, who examined Plaintiff and noted lower extremities at 3

---

[6]www.ncbi.nlm.nih.gov/pubmed/16121472 (visited on September 2, 2016).

to 4/5 and that she tested positive for straight-leg bilaterally.  R. 2059.  Dr. Datta diagnosed chronic cervical spine pain with upper extremity dysesthesias, centralized disk protrusion at C4-5 and annular tear at C6-7; lumbar degenerative disk disease with left broad-based herniation at L5-S1 impacting the neural structures; migraine headaches; history of head injury with headaches; and anxiety/depression. R. 2060. A needle examination by Dr. Voepel showed the absence of right H-reflex, which might  indicate a chronic right S1 radiculopathy.  R. 2051.

In October 2012, at her appointment with Dr. Weiss, Plaintiff stated that she was having more anxiety attacks, fatigue, and trouble with memory, echoed by her family members he noted that Plaintiff's memory and cognitive abilities were reduced, she had reduced cervical and lumbar spine motions and the thoracic spine exam revealed spasms and tenderness.  R. 1820-22.  Dr. Weiss recommended surgery at L5-S1 as her pain was worse and she had not responded to conservative treatment, and she was on high dose narcotics. R. 1822). Dr. Weiss opined Plaintiff was temporarily totally disabled from October 19, 2012 until December 14, 2012 due to a neurological medical condition. R. 1823.

Throughout October and November 2012, continued to complain to Dr. Datta and Dr. Voepel of severe back and neck pain and headaches, even after treatment with radio frequency ablation by Dr. Voepel; he noted that the lumbar paraspinal was maximally tender at L5-S1 and the straight leg was positive.  R. 2045-49.  Dr. Weiss (or his staff) completed an "Organic Mental Disorders Treating Physician Data Sheet" dated November 9, 2012 opining that Plaintiff had a memory impairment because per patient's family she was having difficulty with word finding and neurologic exam revealed memory and cognitive abilities were reduced. R. 2023. He also opined Plaintiff had marked restriction in activities of daily living due to difficulty cleaning, unable to lift more than 5 pounds, unable to perform repetitive work, unable to do prolonged sitting, prolonged standing or walking; she had marked difficulties in maintaining social functioning, had anxiety attacks; and was markedly

limited in understanding and memory, including her ability to understand and remember short and simple instructions, and in her ability to sustain concentration and persistence as well as all areas of adaptation. R. 2025-28.

In December 2012, the treating orthopedic surgeon, Dr. Datta ordered a CT of the lumbar spine post discogram which determined that there was a left moderate to large size disc protrusion with associated annular tear impressing on the left S1 nerve root, with mild bilateral facet arthropathy with resultant mild to moderate left neural foraminal narrowing. R. 2037-39.  Plaintiff had tried extensive pain management with Dr. Layton with no long-lasting relief of her neck and back pain, based on the CT diskogram, he diagnosed disk herniation and annular tear of L5-S1; degenerative disk at L5-S1; debilitating back and right leg pain with concordant reproduction on diskogram; chronic neck and bilateral arm pain with mild bulging disks of the cervical spine, greatest at C5-C6, C6-C7. R. 2034. Based on these diagnoses, Dr. Datta recommended a L5-S1 laminectomy, fusion, and Transforaminal Lumbar Interbody Fusion, estimating about a 70% chance of success, with success being defined as relief of the back and leg pain; for the neck, he noted they may consider a diskogram versus surgery if she does well with the low back operation and her symptoms resolve. R. 2034.  His goal would be after surgery to get her back working at some point. R. 2035.  He could not predict if this would allow her to return to medical school or residency because there were too many factors involved, but his hope was to get her off all of her pain medications and back to a more functional level; he began the scheduling process. R. 2036.  Unfortunately, two months later, as of March 2013, the pain management specialist Dr. Zaidi (she switched to from Dr. Voepel) noted the lumbar spine surgery had been recommended but Plaintiff was unable to have it because of insurance issues.  R. 2413. Dr. Zaidi also had a "detailed discussion" with Plaintiff about treatment options and medication usage.  The patient understands that treatment can be continued if everything remains appropriate and

consistent.  I have warned her, based on her young age, that addictive issues can come into play as we increase or adjust pain medications."  R. 2415.

Plaintiff continued to receive treatment from Dr. Weiss through March 2013 for complaints of neck, back and lower extremities problems. R. 2406, 2413-14.  Dr. Weiss also completed a "Disorders of the Spine Treating Physician Data Sheet" opining that there was "evidence of nerve root compression" in reduced extension and lateral flexion, but there were no MRI's CTs or myelographies ordered by his office; he also opined Plaintiff needed to change body position or posture to lessen pain every 30 minutes; could only sit and stand for 15 minutes at one time; can sit/stand/walk for less than 2 hours total in an 8-hour workday; and could not lift more than 10 pounds occasionally; and would likely to be absent from work more than 3 times a month on average. R. 2406-11.

Dr. Gopal, who had not treated Plaintiff since July 2011, similarly completed a "Disorders of the Spine Treating Physician Data Sheet" opining Plaintiff had evidence of nerve root compression, needed to change body position or posture to lessen her intractable pain every 30 minutes, was unable to sustain a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living (in 2011), and would be absent from work more than 3 times a month as a result of her impairments or treatment during the time the care was provided from September 28, 2010 to July 8, 2011.  R. 2422-25.  All three physicians, Dr. Datta, Dr. Weiss, and Dr. Gopal signed separate but identical "Pain Interrogatories" forms checking off "yes" that "objective clinical and laboratory findings support Plaintiff's subjective complaints of pain" and "her complaints of pain have been credible throughout her treatment." R. 2402, 2404, 2426.

Plaintiff also suffered from migraine headaches off and on, once in 3-4 months, since her teenage years, more often on the right side, with visual scotomas, pain in her eyes, and occasional blurred vision.  R. 2438.  To treat them, she takes Aleve for the headaches; rest in a dark, quiet room and sleep all help her headaches.  R. 2439.

Plaintiff argues that the ALJ should not have given what appears to be the same or superior "weight" to the opinions of one-time consulting physicians who were performing evaluations for the insurance companies over the opinions of her treating physicians Drs. Gopal, Weiss, and Datta, formed after Plaintiff had suffered two falls with head trauma. The ALJ gave the opinion of Dr. Westerband, an orthopedist who performed a September 2010 IME for the insurer (R. 2445) and found evidence of moderate orthopedic disability, "weight to the extent that it was consistent with the other medical evidence of record." R. 32. Yet the ALJ gave what appears to be less weight– stating "some weight" (R. 32) – to the March 2013 opinions of Dr. Gopal that Plaintiff suffered from an L5-S1 disc herniation which required surgery, and Drs. Weiss that Plaintiff had an abnormal QEEG, she was not capable of performing the demands of sedentary work and was likely to miss work more than three times a month. R. 2406-11. Two months before the ALJ's hearing, Dr. Datta had scheduled Plaintiff for surgery on the L5-S1 disc, but she could not afford the surgery without the insurance.

The ALJ omitted any mention of the abnormal results of the QEEG that indicated a closed head injury, downplayed Dr. Weiss' recommendation for back surgery, and his opinions that Plaintiff could not sit/stand/walk or lift at the level necessary to perform sedentary work. Nonetheless the ALJ stated "Dr. Weiss' opinion is given some weight as it is generally consistent with the other medical evidence of record" (R. 35), but he clearly disregarded portions of Dr. Weiss' opinion and the contemporaneous opinion of Dr. Datta that Plaintiff had a "moderate to large" HNP that required surgery.

Plaintiff also argues that the ALJ should not have given "weight" to the opinions of one-time consulting physicians who were performing evaluations for the insurance companies over the opinions of her treating physicians formed after Plaintiff had suffered two falls with head trauma. The ALJ gave the opinions of Dr. Westerband, an orthopedist who performed a September 2010 IME (R. 2445), and Dr. Sachdev, a neurologist who performed a February 15, 2012 IME, "weight" to the

extent that the opinions were consistent with the other medical evidence of record. R. 32. Dr. Sachdev opined that there was "no permanency" for these spine sprains and strains because he determined that "there was no x-ray, CT scan or MRI scan evidence of traumatic injury to the cervical, thoracic, or lumbar spine" and Plaintiff had no neurological disability; although he reviewed numerous records, Dr. Sachdev did not review records from the treating neurologist Gary Weiss. R. 2439. As to the third and only IME finding disability, the ALJ gave "less weight" to the opinion of Dr. Miller, an orthopedist who performed a February 2012 IME for an insurer, who found that there was "evidence of a disability" (R. 2431-34) because the ALJ found the opinion was "not fully explained." R. 34.

The ALJ erred in giving the superseded 2010 opinions of Drs. Westerband and Sachdev more weight in finding Plaintiff could perform sedentary work over the opinions of several treating physicians, Dr. Weiss and Dr. Datta. The ALJ gave what appears to be less weight– even though he described "some weight" (R. 32) – to the March 2013 opinions of Dr. Gopal that Plaintiff suffered from an L5-S1 disc herniation which required surgery, and Dr. Weiss that Plaintiff was not capable of performing the demands of sedentary work and was likely to miss work more than three times a month, and Drs. Weiss and Datta's opinions that Plaintiff required surgery based on the L5-S1 diskogram results. Accordingly, the ALJ's decision was not based on substantial evidence.

### 2. *Mental limitations*

Plaintiff also argues that the ALJ also erred in assessing her mental limitations from anxiety disorder and depression and in giving less weight to the opinion of the treating psychologist Dr. Elmore because the ALJ found it was "not consistent with the other medical evidence of record, including more recent treatment notes, which indicate that the claimant's mental health appears to be stable." R. 36. The Commissioner argues that Plaintiff failed to prove that her mental impairments imposed disabling or additional limitations on her ability to work, or met a particular Listing, and

substantial evidence supports the ALJ's decision to give less weight to Dr. Elmore's opinion because it was not consistent with the other medical evidence.

Plaintiff first started having anxiety attacks in medical school and her anxiety became worse after the motor vehicle accident in June 2010.  R. 1444.  In late 2011 to early 2012, Plaintiff saw psychiatrist Dr. Bunt of Advanced Behavioral Care for an initial psychiatric evaluation[7], complaining of depression, anxiety, and panic attacks, with other symptoms including insomnia, low energy/fatigue, feelings of worthlessness, decreased ability to think or concentrate, and moderately severe mood disturbance; she reported episodes of anxiety 3-4 hours long and occurring 2-3 times a week. R. 1444.  Dr. Bunt diagnosed Plaintiff with severe anxiety, persecutory ideation, impaired short term memory, and fair insight and judgment, Major Depression, in partial remission; Panic Disorder with Agoraphobia, rule out Generalized Anxiety Disorder; Anxiety Disorder; PTSD; and Bereavement. R. 1445-47, 1634, 2023.  Dr. Bunt noted in May 2012 that Plaintiff's reported daily panic attacks were cued by repeated phone calls from collection agencies; she remained moderately anxious, depressed, and her memory appeared grossly somewhat impaired.  R. 2391-93.

The ALJ found that "[t]roughout her care at Advanced, the claimant has reported both improvement and minor setbacks. The claimant's treatment at Advanced has consisted of both psychotherapy and pharmacotherapy, with the claimant trying a combination of different medications to manage her conditions. . . . Dr. Bunt's opinion is given weight, as the claimant has established a significant treating relationship with Dr. Bunt and he has been able to observe the claimant's progression of health." R. 36.

The ALJ also reviewed the records of Dr. Elmore who opined in March 2013, that Plaintiff had for one year been "suffering from a depressed mood and anxiety, both of which make daily living

---

[7]In a May 2011 Neuropsychological Evaluation, Drs. Facchini and Masur noted the current test results indicated wide-spread, global difficulty in many areas of functioning, but questioned the validity of the testing because results were markedly below expected performance given Plaintiff's overall achievement and reported academic functioning R. 653-59.

challenging even without the added complications of medical problems." R. 2428. Dr. Elmore noted

Plaintiff had become socially isolated and experienced intense panic attacks that forced her to remain

largely homebound, and she experienced memory and concentration difficulties, and cognitive

functioning has clearly declined[8]. R. 2428.  The ALJ gave these records less weight because the ALJ

determined that Plaintiff's "mental health appeared to be stable."  R. 36.

The ALJ found that the opinions of Plaintiff's "mental health have been consistent in that they

agree that the claimant suffers from some mental limitation, however, not to such a severity as to

preclude work activities."  R. 37.  The ALJ also determined that "the claimant suffers from moderate

limitation in both social functioning and maintaining concentration, persistence, and pace."  R. 37.

 He determined that Plaintiff was capable of performing "simple, unskilled tasks in a routine setting"

with occasional changes and only occasional interaction with the public. R. 37.  The Eleventh Circuit

held in *Winschel v. Commissioner of Social Security*, 631 F.3d 1176, 1180-81 (11th Cir. 2011), that

the ALJ must account – explicitly or implicitly– for limitations in concentration, persistence, and

pace.  The Eleventh Circuit has also held, in discussing *Winschel,* that a hypothetical question can

sufficiently account for an impairment in concentration persistence and pace by including a restriction

to simple or routine tasks if the medical evidence demonstrated that the claimant had the ability to

perform those tasks despite limitation in concentration, persistence or pace. *Jarrett v. Commissioner

of Soc. Sec.,* 422 Fed. Appx. 869, 872 n. 1 (11th Cir. 2011) (unpublished).  On remand, the ALJ will

point out the medical evidence which demonstrates Plaintiff had the ability to perform those tasks

despite limitation in concentration, persistence or pace.

---

[8]In documents submitted to the Appeals Council, Dr. Elmore opined on September 3, 2013 that Plaintiff was unable to meet competitive standards in many areas of unskilled work including maintaining attention for two hour segments and maintaining regular attendance; she would be absent more than four days per month from work due to her impairments or treatment; and he opined that "The severity of [Plaintiff's] psychological and physical symptoms would make it extremely difficult for her to sustain a regular job at this time. Her cognitive impairments, anxiety, and depression require further treatment."  R. 8-9.

Also in assessing Plaintiff's limitations, the ALJ implicitly discounted Plaintiff's credibility in analyzing her testimony of disabling pain without properly following the Eleventh Circuit's framework. R. 26-39.  The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence.  20 C.F.R. § 404.1528.  In determining whether the medical signs and laboratory findings show medical impairments which reasonably could be expected to produce the pain alleged, the ALJ must apply the Eleventh Circuit's three-part "pain standard":

> The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

*Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (quoting *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991)).  Pain alone can be disabling, even when its existence is unsupported by objective evidence, *Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992), although an individual's statement as to pain is not, by itself, conclusive of disability.  42 U.S.C. § 423(d)(5)(A).  Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.  *Jones v. Dep't of Health and Human Servs.*, 941 F.2d 1529, 1532 (11th Cir. 1991) (articulated reasons must be based on substantial evidence).  A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record.  *Foote*, 67 F.3d at 1561-62; *Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).  On remand, the ALJ will apply the Eleventh Circuit's pain standard.

**C. Other issues**

As Plaintiff points out, although the ALJ found that Plaintiff's date of last insured was December 31, **2012** (R. 28), the Social Security Earnings Record appears to indicate that December 31, **2016** is the date last insured.  R. 257.  On remand, the ALJ will determine the correct date of last insured.

Although Dr. Datta of the Back Center recommended and scheduled surgery to relieve Plaintiff's back and leg pain (R. 2034), and she wanted to proceed with the surgery (R. 2042), Plaintiff subsequently told Dr. Zaidi (also of the Back Center) that "unfortunately she cannot have surgery because of insurance related issues." R. 2414. The ALJ did not discuss Dr. Zaidi's treatment records at all (Ex. 60F), although they were submitted on March 26, 2013 (R. 2412), well before the ALJ's decision was finalized on July 9, 2013 (R. 39).

The ALJ also did not discuss Plaintiff's inability to afford the recommended back surgery. On remand, the ALJ will fully consider the prescribed treatment and Plaintiff's inability to afford it. *See Lucas v. Sullivan*, 918 F.2d 1567, 1572–73 (11th Cir. 1990) (an ALJ may not draw an adverse inference from a claimant's failure to pursue recommended treatment without inquiring about the claimant's reasons for not doing so and addressing those reasons in the decision); SSR 96-7p, 61 FR at 34487 ("[T]he adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment."). If a claimant has a good reason for not pursuing a course of treatment, such as inability to pay, the ALJ may not punish the claimant for not doing so. *Dawkins v. Bowen*, 848 F.2d 1211, 1214 (11th Cir. 1988).

## IV.   CONCLUSION

For the reasons set forth above, the ALJ's decision is not consistent with the requirements of law and is not supported by substantial evidence.   Accordingly, the Commissioner's decision is **REVERSED** and **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g).   The Clerk of the Court is directed to enter judgment consistent with this opinion and, thereafter, to close the file.

**DONE and ORDERED** on September , 2016.

_David A. Baker_

DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE